70 F.3d 1273
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Charles Warren BROWN; Steven Gunter; David Willie
Williams; Keith Murdock Williams; and William E.
Smith, a/k/a William Smith, a/k/a Dante
Wilson, Defendants-Appellees,
Charles Yarbrough, Defendant.
 No. 95-5114.
 United States Court of Appeals, Sixth Circuit.
 Nov. 28, 1995.
 
 Before: CONTIE, NELSON, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 The government appeals the district court's order granting the defendants' motion to suppress, contending that the district court erred in suppressing "photographs, fingerprints, and all other evidence obtained or derived from exploitation of those photographs and fingerprints," when the photographs and fingerprints were obtained during an arrest that, on appeal, the government concedes was illegal. Because the record before us is not adequate to permit appellate review, we will vacate the district court's judgment, and remand with instructions to the district court to state its findings of fact and conclusions of law and enter an appropriate judgment.
 
 I.
 
 2
 Several unidentified men committed a robbery at Fountain Fine Jewelry in Memphis, Tennessee, in December 1992. Some weeks later, two officers with the Memphis Police Department each received an anonymous telephone call, informing the officers that one Charles Brown was a participant in the robbery. The second call advised that Brown was in Memphis, and intended to "pull another robbery" because the Fountain Jewelry robbery had been "so successful." The Memphis Police determined that Brown had registered as a guest at the Memphis Inn, but because Brown had checked out by the time the police arrived, they could only obtain the clerk's agreement to contact them if Brown ever registered again.
 
 
 3
 The clerk called the Memphis Police in October 1993, to advise that Brown was once again a guest, along with three other men. Memphis Police decided to put Brown and his companions under surveillance. The surveillance began on October 9, and continued until October 11, when Brown and five men loaded luggage into a minivan and a sedan, checked out of the Inn, and departed. Although the police observed no illegal conduct during the three-day surveillance, they nonetheless followed the vehicles in ten to fifteen Memphis Police cars, as the defendants traveled east on route I-40.
 
 
 4
 The Memphis Police contacted the Tennessee Highway Patrol to request assistance. The Memphis officers could not follow the vehicles any farther than Jackson, the limit of the Memphis Police's jurisdiction. According to the Memphis Police officer who directed the surveillance, the Memphis Police "didn't have any idea where these people were going at that time, so [they] could have ended up anywhere." As a result, the officer "terminated the surveillance" and requested that the Tennessee Highway Patrol stop the vehicles. That officer acknowledges that the sole purpose for stopping the defendants was simply to identify them.
 
 
 5
 The Tennessee Highway Patrol, along with the Memphis Police, executed what they termed a "felony stop." The defendants were directed to "come out with their hands up," while the officers took "defensive positions ... behind vehicles," with their weapons drawn. The defendants were then made to lie on the ground, and were handcuffed with their arms behind their backs. The Memphis Police officer who took charge of the stop told the drivers, untruthfully, that the reason for the stop was "that some lady had seen them and thought ... that she had been the victim of a crime and thought that they were responsible for it." He asked if he could search their vehicles, and "told them [he] was looking for weapons or drugs." They consented to the search, which failed to reveal any contraband.
 
 
 6
 The defendants were kept handcuffed the entire time they were at the side of I-40. Polaroid photographs were taken of them because "it was believed that they were going to commit some armed robberies of jewelry stores, and [so they] took the photos for identification purposes." Then, the officers decided to "get them identified for positive identification. And ... one of the troopers suggested [they] take them back to the post ... in Jackson[.]" Accordingly, the defendants were then taken, in handcuffs in the backseat of the patrol cars, some twenty miles away, where they were fingerprinted. They were only released "when [the police] got confirmation back [from the FBI] on the fingerprints as to their true identities and that there was ... no outstanding felony warrants for them."
 
 
 7
 Five days after this incident, several individuals committed an armed robbery at a Service Merchandise store in Nashville, Tennessee. Some eight months later, the six defendants were charged in an eight-count second superseding indictment with various crimes relating to that armed robbery. Defendant William Smith filed a motion to suppress, in which all other defendants but Charles Yarbrough, who was not present at the Jackson stop, joined.
 
 
 8
 The record is unclear as to what evidence, if any, was derived from the photographs and fingerprints. Indeed, during the suppression hearing, defense counsel represented that they were unaware of the extent of any derivative evidence:
 
 
 9
 [W]e, the defendants, don't know the exact course of the disposition of the fruits of the search [and we therefore suggest] that the Court just rule that the search itself and the seizure of the fruits is unlawful.
 
 
 10
 ....
 
 
 11
 [T]his Court should ... order the Government to provide the defendants in this case ... with information showing the distribution of the Polaroid photographs, of the fingerprint information and of the information that was gathered requiring my client and Mr. Brown to identify themselves through their driver's licenses..... I am not sure that you can rule exactly on the implications of this search in this case until this case proceeds....
 
 
 12
 In granting the motion to suppress, the district court failed to address these concerns. Instead, it first addressed the government's argument, made below although not renewed here, that the episode in Jackson was legal, and held that "under the totality of the circumstances, the Government lacked a reasonable suspicion of articulable facts of criminal activity or involvement in a complete crime when it made the stop in Jackson...." The district court then concluded simply that "because the stop was illegal, the photographs, fingerprints, and all other evidence obtained or derived from exploitation of those photographs and fingerprints are tainted and inadmissible in this trial." The court failed to set forth what evidence, in particular, was within the scope of its order.
 
 II.
 
 13
 We are asked in this appeal to decide the correctness of the district court's suppression order. This is a task that we are wholly unable to perform. The record with which we are presented is simply inadequate to permit appellate review, as the district court failed to make sufficient findings of fact and conclusions of law.
 
 
 14
 In order to conduct a satisfactory review, this court needs to know what evidence, precisely, was suppressed by the district court's order. We are not advised by the district court what evidence was "obtained or derived from exploitation" of the illegally obtained photographs and fingerprints, nor are we advised as to whom this evidence was suppressed. According to the government's brief, the fingerprints of David Willie Williams were used to obtain an FBI photograph of him, which was then, following the Service Merchandise robbery, placed in a photospread and identified as being a photograph of one of the Service Merchandise robbers. Further, when the investigation by the FBI of the Service Merchandise robbers revealed that an individual known as Dante Wilson was a participant, the fingerprints obtained during the illegal stop were used to determine that his true name was William Elsworth Smith. Importantly, however, neither these items of evidence nor any others were named in the district court's order. We are simply unable to discern whether the district court's order encompasses this evidence, or encompasses this evidence and this evidence only, or whether it extends beyond this evidence.
 
 
 15
 We further note that the district court entered its order in response to a motion brought on behalf of just one of the defendants, William Smith. Although that motion was subsequently joined in by his codefendants, naturally enough, Smith's motion was directed solely at evidence that would be admissible against him. Because the joinders of the other defendants provided no additional information, we have no way of knowing whether different tainted evidence has been obtained in connection with these codefendants, and we cannot be certain, based on the record, that the evidence alluded to by Smith is the only evidence derived from the illegal stop.
 
 
 16
 In short, the district court's opinion is simply too sparse and conclusory to provide an adequate basis for appellate review. See United States v. Claycraft Co., 408 F.2d 366, 366-67 (6th Cir.1969).
 
 III.
 
 17
 We therefore VACATE the district court's judgment and REMAND with directions to make detailed findings of fact and conclusions of law, identifying with specificity the evidence that has been suppressed, and with respect to whom. This remand does not restrict the discretion of the district court to permit any party to submit further proof.